IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) DEANA LUNSFORD, AS SPECIAL, )
ADMINISTRATOR OF THE ESTATE OF )
JONATHAN RANDELL, DECEASED, )
)
   Plaintiff, )
) Case No. 22-cv-00347-CVE-JFJ
v. )
) JURY TRIAL DEMANDED
(1) CITY OF TULSA, OKLAHOMA, )
(2) JOSHUA HYMAN, )
(3) CODY RILEY, ) ATTORNEY LIEN CLAIMED
(4) WILLIAM SHANKS, )
(5) JUSTIN MCREE, )
(6) CHAD CUNNINGHAM, )
(7) TYLER BUTLER, )
(8) DAKOTA JONES, and )
(9) BRANTON MILLER, )
)
   Defendants. )

## COMPLAINT

**COMES NOW**, Plaintiff Deana Lunsford ("Plaintiff"), as Special Administrator of the Estate of Jonathan Randell, deceased ("Mr. Randell") and for her causes of action against the above-named Defendants, alleges and states the following:

### PARTIES, JURISDICTION AND VENUE

1.  Deana Lunsford is a citizen of the State of Oklahoma and the Special Administrator of the Estate of Jonathan Randell, deceased.

2.  Defendant City of Tulsa, Oklahoma ("City" or "Defendant City of Tulsa") is a municipality located in Tulsa County, Oklahoma. The City provides and employs the Tulsa Police Department ("TPD").

3.  Defendants Cody Riley, Joshua Hyman, William Shanks, Justin McRee, Chad Cunningham, Tyler Butler, Dakota Jones, and Branton Miller (collectively, the "Officer

Defendants"), were, at all pertinent times, officers in the Tulsa Police Department ("TPD"), employed by Defendant City of Tulsa. At all pertinent times, the Officer Defendants were acting within the scope of their employment and under color of State law. Based upon information and belief, the Officer Defendants were residents of Tulsa County, Oklahoma at the time of the incidents described herein. The Officer Defendants committed underlying violations of Mr. Randell's constitutional rights, explained below in more detail

4.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

5.      The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

6.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

- **Facts Specific to Jonathan Randell**

7.      Paragraphs 1-6 are incorporated herein by reference.

8.      On or about August 8, 2020, 25-year-old Jonathan Randell experienced a severe mental health breakdown.

9.      Mr. Randell decided to walk to a woman's shelter in Tulsa, OK to visit a friend, whom, upon information and belief, Mr. Randell thought could help him get through his mental health episode.

10. When Mr. Randell was spotted climbing a fence at the shelter, employees of the shelter called 9-1-1.

11. A member of Community Outreach Psychiatric Emergency Services ("COPES") arrived at the shelter along with several Tulsa Police Department ("TPD") Officers.

12. The COPES representative attempted to talk to Mr. Randell but was ordered to back away by the TPD Officers after Mr. Randell pulled a small pocket knife out of his pocket and held it in his hand.

13. At this time, Mr. Randell was sitting down on a bench next to the shelter's front door (which was locked and secured) and numerous TPD Officers, including the Officer Defendants, approached him and created a perimeter around him.

14. The officers parked a TPD patrol car in the carport near the bench where Mr. Randell was sitting, approximately 15 feet away from him.

15. Several officers stood behind the TPD vehicle, and other officers stood off to the side, approximately 20-30 feet away from where Mr. Randell was sitting.

16. A few of the officers were also protecting themselves with "riot shields."

17. All of the officers knew that Mr. Randell was not armed with a gun, and that the only "weapon" he had was a pocket knife that had an approximately two-inch blade.

18. Around this time, TPD Detective Pablo Zuniga began talking to Mr. Randell behind the cover of the TPD patrol car.

19. Detective Zuniga attempted to negotiate with Mr. Randell, who repeatedly expressed that he did not want to go to jail.

20. During the negotiations, Mr. Randell continued to sit on the bench and never made any verbal or physical threats to any of the officers. The pocket knife remained in his hand, which rested on his leg.

21. While Detective Zuniga was negotiating with Mr. Randell, he was approached by TPD Lieutenant Clay Ballenger. Lt. Ballenger, along with TPD Sergeant Poth, were commanding the scene.

22. Lt. Ballenger told Detective Zuniga that he felt that the officers were too close to Mr. Randell, and it left them with only "one option," with the implication that their only option was to use force on Randell.

23. Lt. Ballenger wanted to back the perimeter up so that the officers would have additional options, but Detective Zuniga requested to stay where they were because he felt he would have difficulty communicating with Mr. Randell from a farther distance.

24. Lt. Ballenger then told Detective Zuniga to remind Mr. Randell that he was not free to go because he apparently had an outstanding felony warrant.

25. Lt. Ballenger acknowledged that the warrant was a "weak felony warrant," implying that it was not for a serious crime.

26. When Detective Zuniga relayed this information to Mr. Randell, he became upset and reiterated that he did not want to go back to jail.

27. A short time later, Mr. Randell began self-harming with his pocketknife. He began making short swipes on his left arm with the pocketknife, which was in his right hand.

28. At this time, Lt. Ballenger ordered TPD Officers Geppelt and Blizzard to fire their less lethal weapons at Mr. Randell.

29. Officer Blizzard fired approximately four (4) pepper gun rounds at Mr. Randell from a distance of approximately 15 feet. Officer Blizzard hit Mr. Randell with at least one of the pepper gun rounds.

30. Officer Geppelt fired two "beanbag" rounds from his beanbag shotgun at Mr. Randell and landed both shots.

31.     As Officers Blizzard and Geppelt discharged the less lethal weapons, several officers yelled at Mr. Randell to drop the pocketknife.

32.     After Mr. Randell was struck by the pepper balls and beanbag rounds, he moved around in pain and discomfort for a few seconds before standing up and tossing the pocketknife a few feet away from him.

33.     After releasing the knife, Officer Defendants instantly unleashed a flurry of rounds at Mr. Randell, who was now completely unarmed. Due to the distance between the Officer Defendants and Mr. Randell at the time he tossed the pocketknife, and the fact that the Officers were all behind the cover of a patrol vehicle and/or riot shield, Mr. Randell throwing the knife did not pose a threat to any of the officers or anyone else.

34.     Upon being shot, Mr. Randell immediately crumpled to the ground, covered in blood. Each of the Officer Defendants shot Mr. Randell with multiple rounds.

35.     As Mr. Randell lied on the ground, clearly unarmed, the Officer Defendants fired dozens of additional shots. Mr. Randell's body ultimately had over 50 bullet wounds from both TPD-issued handguns and rifles.

36.     Mr. Randell was pronounced dead almost immediately on the scene.

37.     Notably, neither Detective Zuniga nor Lt. Ballenger even had their weapons drawn and did not fire at Mr. Randell, despite them being the closest to him.

38.     At the time of the shooting, the Officer Defendants (and all other officers in the general vicinity of Mr. Randell) were all either safe behind cover of the TPD patrol unit, riot shields, or at such a far distance away from Mr. Randell that he did not pose any kind of threat to them.

39.     Indeed, at the time of the shooting, Mr. Randell posed no threat to any TPD officer or any other person.

40.     Because of the perimeter established by TPD, Mr. Randell was trapped against the entrance of the shelter, and could not flee the officers.

- **Policies, Practices, and Customs of the Tulsa Police Department**

41.     Paragraphs 1-40 are incorporated herein by reference.

42.     TPD has a pattern of using unnecessary and excessive force on civilians, especially those who are not suspected of serious crimes.

■ **Ira Wilkins Incident**

43.     For example, on February 5, 2017, TPD officers encountered Ira Lee Wilkins ("Mr. Wilkins") while he was sitting in his parked car at Jackie Cooper Imports of Tulsa, at 9393 South Memorial Drive in Tulsa, OK.

44.     Three TPD Officers, Officer Will Mortensen ("Officer Mortensen"), Angela Emberton ("Officer Emberton") and Edel Rangel ("Officer Rangel") were involved in Mr. Wilkins' subsequent arrest. Mr. Wilkins filed suit, pursuant to 42 U.S.C. § 1983, alleging excessive use of force.

45.     In denying qualified immunity to Officers Mortensen, Emberton and Rangel, the United States Court of Appeals, Tenth Circuit, held and reasoned as follows:

> [A] reasonable jury could find that the officers' use of pepper spray was objectively unreasonable. ***Mr. Wilkins thus showed he suffered a constitutional violation.*** …
>
> Under the first factor—severity of the crime—only minimal force was warranted. The officers suspected Mr. Wilkins of committing the crime of actual physical control of a motor vehicle while intoxicated, a misdemeanor in Oklahoma.
> \*\*\*
> The second factor weighs against the officers because Mr. Wilkins did not pose an immediate threat after the takedown. He was facedown on his stomach, handcuffs secured his arms, officers were on him, Officer Emberton held his legs, and he did not resist. … During the nearly 30 seconds preceding the pepper spray, Mr. Wilkins said "please, man," "you're breaking my f---ing wrists," and "I'm not doing nothing

> to you." … He did not present an immediate threat when Officer Mortensen sprayed him with pepper spray. …
>
> In *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006), we determined the suspect did not pose an immediate threat because, though he held a small knife, he "made no threats[,] was not advancing on anyone," and "had not affirmatively led anyone to believe that he had a firearm." *Id.* at 1159-60. We said that, based on the angle of the suspect's hands and the lighting at the scene, the officer unreasonably believed that the suspect was pointing a gun at him. *Id.*
>
> \*\*\*
>
> In sum, the use of pepper spray was unreasonable. Mr. Wilkins was not resisting, was not a threat to officer safety, and was under the officers' control.

*Wilkins v. City of Tulsa, Oklahoma*, 33 F.4th 1265, 1274–75 (10th Cir. 2022) (emphasis added).

### ■ Ernie Fields Incident

46.   On or about October 16, 2018 at just before 6:00 a.m., TPD Officers encountered Earnest Joe Fields ("Mr. Fields") at a QuikTrip store located at 4545 N. Lewis Avenue, Tulsa, OK 74110.

47.   TPD Officers Comfort, Temple, and Jamgochian-Sallee responded to an alleged domestic dispute call in the QuikTrip parking between Mr. Fields and his wife. lot.

48.   When the officers arrived at the QuikTrip, Mr. Fields was in the store making a cup of coffee and his wife was in her car at the air pump.

49.   Upon speaking to Mr. Fields' wife, the alleged victim, officers learned that the information provided to dispatch was not accurate and that no arrestable offense had occurred.

50.   Without probable cause or reasonable suspicion that Mr. Fields had committed a crime, Officers Temple and Comfort attempted to detain Mr. Fields, who was in the process of paying for his coffee and gas.

51.   Officer Comfort ordered Fields to stay inside the QuikTrip, while Officer Temple ordered Fields to come out the front door to talk to him.

52. Officer Comfort held open one of the doors of the QuikTrip and stood next to Mr. Fields while Officer Temple stood just outside of the QuikTrip, facing Mr. Fields.

53. Mr. Fields told the Temple and Comfort that he was going to go pump the gas that he'd just paid for and was happy to answer any questions they had, that he was not going to leave and would come right back.  Fields placed his keys and jacket on the counter of the QuikTrip.

54. As Mr. Fields calmly walked towards his car to pump his gas – and despite having followed all of Temple's and Comfort's commands and staying composed – Mr. Fields was then forcefully and unnecessarily tackled from behind by Officer Comfort.

55. Officer Comfort slammed Mr. Fields to the cement sidewalk, causing significant injury.

56. At the time of this forceful takedown, Mr. Fields was: (a) not suspected of committing any serious crime; (b) not disobeying any lawful commands; (c) not posing any threat of physical harm to the Officers' (or anyone else); (d) not attempting to flee; and (e) not resisting arrest.

57. Mr. Fields filed multiple complaints with Internal Affairs at TPD.  The only disciplinary action taken after TPD reviewed the use of force was verbally counseling for failing to report the use of force, as TPD policy required any use of force resulting in injury to be reported.

- **Michael Delaney Incident**

58. On March 21, 2020, Michael Delaney was sitting in his parked vehicle near 2800 S. Pittsburg Avenue in Tulsa, OK.

59. At all pertinent times, Mr. Delaney was parked on the side of the road, posing no threat to any persons or property.

60. At approximately 1:00 a.m. on March 21, 2020, Officer Russell was allegedly dispatched to Mr. Delaney's location on account of "a suspicious person in an SUV."

61. Mr. Delaney, who had committed absolutely no crime and was in his own vehicle, rolled down his window to speak with Officer Russell while two other TPD Officers stood to the side of Mr. Delaney's SUV.

62. Mr. Delaney was being cooperative and answering Officer Russell's questions when, suddenly, Officer Russell pulled his gun out of his holster, pointed it at Mr. Delaney, and began shouting at him.

63. Officer Russell then opened Mr. Delaney's front driver's side door, took a couple of steps back, pointed his gun at Mr. Delaney, and told him to get out of the car.

64. Confused as to why Officer Russell suddenly began to shout and point his gun at him, and fearing that he was about to be shot and killed, Mr. Delaney began driving away.

65. At the time that Mr. Delaney began driving away, no TPD Officer, nor any bystanders or any other people, were in front of the vehicle or in any danger whatsoever.

66. In fact, the other TPD Officers were several feet to the side of the vehicle and parallel to the back end of the SUV.

67. Once Mr. Delaney began driving away, Officer Russell fired at least five (5) shots at Mr. Delaney, landing one bullet in Mr. Delaney's left shoulder.

68. At the time that Officer Russell fired his first shot, he was approximately 5-7 feet to the left of the SUV and 5-7 feet behind the SUV's back tires.

69. All of the bullets fired by Officer Russell entered the left and/or back portions of the SUV. The third, fourth, and fifth shots were fired when the SUV was several car lengths ahead of all of the Officers.

70. TPD later released a statement in conjunction with the footage stating, "Review of the in-car video and body worn camera evidence ***did not support*** the initial belief that officers were assaulted with a vehicle..." (Emphasis added).

71. Indeed, Officer Russell was subsequently indicted by a grand jury with one count of Reckless Handling of a Firearm. On August 11, 2021, Officer Russell pled "no contest" to the charge and was given an eighteen (18) month deferred sentence. *See* CM-2020-3039; Tulsa County District Court.

- **Jacob Rucker Incident**

72. TPD Officers still repeatedly use excessive force on compliant, subdued, and/or civilians who pose no threat of serious harm, even after the instances described, *supra*, which is evidence that the unconstitutional practices are allowed to continue unabated.

73. For example, on November 5, 2020, Jacob Rucker was shot and killed by TPD Officers near the OYO Hotel, which is located in the 1000 block of North Garnett Road in Tulsa.

74. Four Officers, including Officer Mortensen, opened fire on Rucker when he posed no threat to the officers, killing him.

75. The aforementioned incidents are consistent with longstanding TPD practices and/or customs. These practices/customs include an utter failure to train and supervise officers, particularly in the areas of de-escalation and dealing with mentally unstable suspects, a failure to discipline officers for excessive force, and maintaining a culture condoning the use of reckless force while ignoring de-escalation tactics. Upon information and belief, TPD academy and field trainers knowingly consistently train TPD Officers use of force tactics that are unconstitutional.

## CAUSES OF ACTION

### I.

### VIOLATION OF THE FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

**A.    Individual Liability and Underlying Violation(s) of the Constitution (The Officer Defendants)**

76. Paragraphs 1-75 are incorporated herein by reference.

77. At the time of the complained of events, Mr. Randell, as a free person, had a clearly established constitutional right under the Fourth Amendment to be secure in his person and free from unreasonable seizure through objectively unreasonable excessive force to injure him and his bodily integrity.

78. In the totality of the circumstances, Mr. Randell was only armed with a small knife, was cornered by the officers and had no ability to flee, and in no way posing any immediate threat of serious bodily harm to the safety of TPD officers or others.

79. Mr. Randell was not a threat to any officer, or to any other person at the time the Officer Defendants fired their guns at him.

80. Any reasonable police officer would, or should, have known of these rights at the time of the complained of conduct as they were clearly established at that time.

81. The Officer Defendants' actions of using deadly force on Mr. Randell, when he was not a danger to anyone, were objectively unreasonable and excessive under the circumstances, and thereby violated the Fourth Amendment rights of Mr. Randell.

82. The Officer Defendants' actions were in reckless disregard of Mr. Randell's federally protected rights.

83. The Officer Defendants' use of objectively unreasonable, excessive deadly force restrained Mr. Randell of his freedom and caused him multiple serious bodily injuries, including death, as well as mental pain and anguish, and the damages alleged herein.

84. As direct and proximate result of the Officer Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Mr. Randell's rights secured by the U.S. Constitution, including punitive damages.

85.     Plaintiff is entitled to punitive damages against the Officer Defendants for their reckless disregard of Mr. Randell's federally protected rights.

**B.      Municipal Liability (City of Tulsa)**

86.     Paragraphs 1-85 are incorporated herein by reference.

87.     There is an affirmative link between the deprivation of Mr. Randell's constitutional rights and TPD policies, practices and/or customs which the City promulgated, created, implemented and/or possessed responsibility for.

88.     Prior to the excessive use of force on Plaintiff, there have been numerous other instances of constitutional deprivations within the TPD that the City was aware of, but failed to alleviate, as discussed in ¶¶ 42-75, *supra*.

89.     In deliberate indifference to the harm likely to result, the City took either no remedial action, or inadequate remedial action, in response to the prior constitutional violations conducted by its officers.

90.     Thus, the City has created and tolerated and maintained long-standing, unconstitutional department-wide customs, law enforcement related policies, procedures and practices, and failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference with respect to uses of excessive force.

91.     The deliberately indifferent training and supervision provided by Defendant City resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant City and were also moving forces behind the violation of Mr. Randell's civil rights and the resulting injuries alleged herein.

92.     As a direct result of Defendants' unlawful conduct, Mr. Randell has suffered serious actual physical and emotional injuries, including death, and other damages and losses as described herein entitling Plaintiff to compensatory and special damages, in amounts to be determined at trial.

**WHEREFORE**, based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages and punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00) with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F
danielsmolen@ssrok.com
bobblakemore@ssrok.com

***Attorneys for Plaintiff***