## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DOUGLAS RUCKER, as Special** | ) | |
| **Administrator of the Estate of Jacob** | ) | |
| **Rucker, deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 23-CV-0237-CVE-MTS** |
| | ) | |
| **CITY OF TULSA, OKLAHOMA et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION AND ORDER

Now before the Court are the following motions: Motion for Summary Judgment of Defendant Drew DeGeorge and Supporting Brief (Dkt. # 77); Motion for Summary Judgment of Defendant Will Mortensen and Supporting Brief (Dkt. # 78); Motion for Summary Judgment of Defendant Michael Snyder and Supporting Brief (Dkt. # 79); Motion for Summary Judgment of Defendant Dylan Myers and Supporting Brief (Dkt. # 80); and Defendant City of Tulsa's Motion for Summary Judgment and Brief in Support (Dkt. # 81). The individual defendants argue that they acted reasonably by using deadly force after Jacob Rucker, the deceased, drove his vehicle toward Tulsa Police Department (TPD) Officer Will Mortensen, crashed into a transformer box, and police officers heard a sound that they believed to be a gunshot coming from Rucker's vehicle. The City of Tulsa (the City) asserts that plaintiff cannot show that an official policy or custom of the City caused a violation of Rucker's constitutional rights.

**I.**

On November 4, 2020, Mortensen was on patrol with TPD Officer Holbrook, and they drove through the parking lot of the OYO Hotel on north Garnett Road. in Tulsa, Oklahoma.[1] Dkt. # 82-2, at 1.[2] Mortensen states that the OYO Hotel is known to be a high crime area for serious crimes such as robberies, weapons offenses, and prostitution. Id. Mortensen and Holbrook observed a white male with visible tattoos sitting in a white Chevrolet Tahoe, and Mortensen intended to initiate a consensual encounter with the man. Id. at 2. Mortensen was wearing his police uniform and was driving in a marked TPD patrol vehicle. Id. The driver of the white Tahoe observed Mortensen approaching his vehicle and immediately began driving away from the hotel. Id. at 2. Mortensen initiated a pursuit of the white Tahoe, but the pursuit was terminated after three minutes when a supervisor deemed the pursuit a risk to public safety. Dkt. # 82-2, at 2-3; Dkt. # 96-2, at 2.

Mortensen investigated the matter further when he returned to the TPD Gilcrease Division on November 5, 2020, and he learned that the white Tahoe had been reported as stolen. Dkt. # 82-1, at 2. Another TPD officer, Jeremy McCasland, had begun investigating the theft of the vehicle on November 4, 2020 and the vehicle had originally been reported stolen from a hotel parking lot in a different part of Tulsa. Dkt. # 82-2, at 3. The video surveillance footage of the hotel from which the vehicle was stolen showed a white male arrive in a four door sedan and drive off in the white Tahoe, and the four door sedan was registered to Jacob Rucker. Id. Mortensen reviewed photographs of Rucker, and he confirmed that Rucker was the driver of the white Tahoe. Id.

---

[1]     The Court will provide a general statement of facts concerning the events of November 4 and 5, 2020, and additional facts specific to each officer will be provided when reviewing each officer's motion for summary judgment.

[2]     Docker # 82 is an appendix of exhibits to the motions of the four individual defendants.

McCasland noted in his report that he went to Rucker's residence late in the evening on November 4, 2020, and he observed a sedan sitting in the driveway. Id. McCasland observed Rucker sitting in the front seat of the sedan with a semi-automatic pistol, and McCasland left the residence to form a plan to safely arrest Rucker. Id. When McCasland and other officers returned to the residence, Rucker had already left the residence and McCasland was not able to arrest Rucker. Id. Mortensen reviewed Rucker's criminal history and found that Rucker had prior convictions for robbery, grand larceny, assault and battery on a police officer, and unlawful possession of a firearm. Id.

On November 5, 2020, Mortensen and TPD Officer Michael Snyder drove to the address where Rucker was found by McCasland the previous day, and they spoke to a neighbor who lived across the street from Rucker's address. Mortensen gave his cell phone number to the neighbor and asked the neighbor to contact him if Rucker returned to the address. Dkt. # 82-1, at 8. Mortensen and Snyder also observed a different stolen vehicle in the driveway of the address where Rucker had been found on November 4, 2020. Id. Mortensen and Snyder left the location to respond to a report of a shooting. Id. at 10. Mortensen received a text message from Rucker's neighbor, and he learned that Rucker had briefly stopped at the address in a red pickup truck and left after gathering some items. Dkt. # 82-2, at 4.

Mortensen and Snyder drove to the OYO Hotel and observed a red pickup truck in the parking lot of the hotel. Dkt. # 82-2, at 5. A white male entered the red pickup truck and began to back out of a parking space, and Snyder pulled up the patrol car behind the red pickup truck. Id. Mortensen got out of the patrol car and walked toward the red pickup truck, and he determined that the driver of the red pickup truck was Rucker. Dkt. # 82-1, at 17-18. Snyder and Mortensen did not activate the lights on their patrol car when they pulled up behind the red pickup truck, because they

did not initially know if Rucker was the occupant of the vehicle. Id. at 20-21. Mortensen believed that it was "urgent" to arrest Rucker, and he opened the door of the red pickup truck with his firearm drawn. Id. at 27-28. Mortensen announced that Rucker was under arrest, and Rucker immediately put the pickup truck in reverse and crashed into the patrol vehicle parked behind the pickup truck. Id. at 36; Dkt. # 82-19, at 0:14-0:17. Mortensen moved to his left across the front of the pickup truck and Snyder approached from the driver's side of the pickup truck with his firearm drawn, and Rucker began driving forward near the area where Mortensen was standing. Dkt. # 82-19, at 0:19-0:21. Mortensen was able to move out of the immediate path of the truck, and he fired three shots as the pickup truck began to accelerate forward and move past him. Dkt. # 82-1, at 42-46. The pickup truck turned slightly to the left as it made contact with the outside wall of the hotel, and the truck continued forward until it crashed into a transformer box. Dkt. # 82-19, at 0:20-0:25.

Mortensen walked toward the location of the pickup track until he heard a bang or popping sound, and Mortensen and Snyder both believed the sound was a gunshot. Dkt. # 96-1, at 75; Dkt. # 96-5, at 20. The popping sound was actually caused by an explosion in a transformer box following the crash, but Mortensen immediately called "he's got a gun" after hearing the sound. Dkt. # 82-5, at 0:33-0:35. Mortensen retreated behind a stairwell about 20 to 25 yards away from Rucker's location, and Snyder sent out a "shots fired" radio dispatch requesting backup at their location. Id. at 0:36-0:39; Dkt. # 82-11, at10. Snyder included in his dispatch that the suspect was a white male armed with a pistol, even though neither Mortensen or Snyder had actually seen Rucker in possession of a firearm. Dkt. # 82-5, at 0:40-0:43. Snyder retreated for cover behind the patrol car, and both Snyder and Mortensen began sporadically firing toward Rucker over the next 20 seconds without attempting to issue any commands to Rucker. Dkt. # 82-4, at 0:24-0:45; Dkt. # 82-5

4

at 0:43-1:03. Rucker is not visible on the officers' body camera footage, but the officers could see Rucker on the ground on the far side of the pickup truck. Snyder believed that Rucker was on the ground reaching for a firearm, and he told Rucker to "stop reaching" and "drop the gun." Dkt. # 82-5, at 1:03-1:09.

TPD Officers Drew DeGeorge and Dylan Myers arrived on the scene, and each of them was holding an assault rifle as they stopped their patrol vehicle next to Mortensen's and Snyder's vehicle. DeGeorge moved next to Snyder in a covered position behind Snyder's patrol car and fired two shots at Rucker. Dkt. # 82-15, at 0:18-0:21. Myers initially attempted to take a position between the patrol cars, but he subsequently moved to the outside of DeGeorge and fired a single shot at Rucker. Dkt. # 82-18, at 0:10-0:30. While DeGeorge and Myers were taking cover, Snyder continued to yell "drop the gun" and "don't move" at Rucker, and he fired several more shots at Rucker until he perceived that Rucker was no longer moving. Dkt. # 82-5, at 1:09-1:33. Myers thought that he saw Rucker moving his hand toward the location where Snyder had indicated that the firearm was located, and he fired another shot about 10 to 15 seconds after the first shot he had fired. Dkt. # 82-20, at 5. The officers were preparing to approach Rucker's position with a ballistic shield for cover, and Snyder fired another shot at Rucker when he saw Rucker move his arm. Dkt. # 82-5, at 2:00-2:15. Snyder fired another shot at Rucker before the officers began their approach, and he told several police officers who arrived on the scene that Rucker was continuing to reach for a firearm and that Rucker had fired multiple shots at police officers. Id. at 3:00-4:20. Snyder, DeGeorge, and Myers approached Rucker's position using a ballistic shield for cover, and the police officers noted that Rucker did not appear to be breathing. Id. at 4:20-4:25. After about two minutes, police officers dragged Rucker from behind the pickup truck, placed him in handcuffs, and began to administer

CPR. Dkt. # 82-15, at 6:10-6:40. However, Rucker was clearly dead from multiple gunshot wounds and CPR had no effect. Dkt. # 82-18, at 6:10-8:30.

By the time police approached Rucker's position, supervising officers and homicide detectives had already arrived on the scene. TPD Sergeant Whitehead observed that Rucker did not have a firearm as officers moved behind the pickup truck and asked Snyder "where's that gun," and Snyder responded that "I don't know where it is now." Id. at 4:25-4:30. In fact, police did not find a gun in or near the pickup truck immediately after the incident, and the pickup truck was later towed to a secure storage area. Dkt. # 96-3, at 4. Police did recover a semi-automatic pistol from the floor of the backseat during a search the following day at the towing facility. Id. at 5. A medical examiner conducted an autopsy and determined that Rucker died as a result of receiving 19 gunshot wounds. Dkt. # 96-15. The incident was subsequently evaluated by a deadly force review committee and TPD chief of police, Wendell Franklin, and the conduct of the police officers was determined to be consistent with TPD's policies concerning the use of deadly force. Dkt. # 96-9, at 11-12. Franklin acknowledges that TPD officers have now been trained not to open a car door while holding a gun in their other hand, because this could create a dangerous situation requiring the use of deadly force by a police officer. Id. at 28-30.

Rucker's estate filed this case alleging § 1983 excessive force claims against the City, Mortensen, Snyder, DeGeorge, and Myers. Dkt. # 4. The case was originally filed by Rucker's estate and the estate of another deceased individual, Jonathan Randell, who also allegedly died after being shot by TPD officers. Defendants filed a motion to sever the claims filed by Rucker's estate and Randell's estate due to a complete lack of factual overlap between the two incidents, and the

6

Court granted the motion to sever. Dkt. # 46. The case now concerns only Rucker's claims against the City, Mortensen, Snyder, DeGeorge, and Myers.[3]

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could

---

[3]    The severed case was styled as Deana Lunsford, as Special Representative of the Estate of Jonathan Randell, Deceased v. City of Tulsa, Oklahoma, 22-CV-347-CVE-MTS (N.D. Okla.), and the Court entered a final judgment closing that case following the filing a joint stipulation of dismissal.

reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

The individual defendants argue that they reasonably believed that Rucker was in possession of a firearm at all stages of the encounter and a reasonable police officer faced with the same circumstances would have determined that the use of deadly force was necessary under the circumstances.  The City argues that plaintiff has not met his burden to show that a constitutional violation occurred or that any constitutional violation was caused by an official policy or custom. Plaintiff responds that Mortensen escalated the encounter by opening the door of Rucker's vehicle with a firearm drawn, and neither Mortensen nor Snyder had any reason to believe that Rucker posed any threat to police while he was attempting to flee in his vehicle.  Plaintiff further argues that Rucker had likely been shot several times as he drove past Mortensen and Snyder, but police officers, including backup officers DeGeorge and Myers, continued to shoot at Rucker after his vehicle crashed and he was lying under the vehicle unable to move.  Plaintiff does not argue that the City maintains an official policy allowing the use of excessive force, but he contends that the City unofficially tolerates or encourages the use of deadly force against suspects who pose no risk of harm to police officers or the public.

## A.

Plaintiff alleges that the individual officers and the City violated Rucker's constitutional rights, and he asserts claims against them under 42 U.S.C. § 1983 for the use of excessive force. Section 1983 provides a cause of action against any "person who, under color of statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States  . . . thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  "The purpose of § 1983 is to deter state actors from using the badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992).  The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity shields public officials from facing the burdens of litigation and is an immunity from suit, not simply a defense to a plaintiff's claims. Serna v. Colorado Dept. of Corrections, 455 F.3d 1146, 1150 (10th Cir. 2006).  The Tenth Circuit applies a two-step analysis to determine if a defendant is entitled to qualified immunity.  A plaintiff must show that the defendant's actions violated a specific constitutional right and, if the plaintiff has shown that a constitutional violation occurred, the plaintiff must show that the constitutional right was clearly established when the conduct occurred.  Toevs. v. Reid, 685 F.3d 903, 909 (10th Cir. 2012). Plaintiff bears the burden to prove that Rucker's constitutional rights were violated and that the law giving rise to his claim was clearly established at the time the acts occurred.  Cox v. Glanz, 800 F.3d 1231, 1246 (10th Cir. 2015); Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).

Plaintiff alleges that Mortensen and Snyder used excessive force at every stage of the encounter when they attempted to arrest Rucker, and plaintiff claims that DeGeorge and Myers failed to independently investigate the circumstances before deciding to use deadly force. The Fourth Amendment governs claims concerning the use of force for a warrantless arrest before a probable cause hearing has been held. Estate of Booker v. Gomez, 745 F.3d 405, 419 (10th Cir. 2014). In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court set out the standards governing excessive force claims under the Fourth Amendment, and as a general matter explained that the reasonableness of the force used requires a "balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396. The reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight," and not "every push or shove . . . violates the Fourth Amendment." Id. Courts evaluating an excessive force claim must consider factors such as the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Estate of Ceballos v. Husk, 919 F.3d 1204, 1213 (10th Cir. 2019) (explaining the Graham analysis for excessive force claims and listing the three Graham factors). The reasonableness inquiry is wholly objective and "an officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . . ." McCoy v. Meyers, 887 F.3d 1034, 1045 (10th Cir. 2018). The use of force may become unreasonable, even if the use of force is initially appropriate, if the person being detained is no longer a threat to the safety of police officers. Dixon v. Richer, 922 F.2d 1456, 1463 (10th Cir. 1991).

10

**B.**

Mortensen argues that his decision to use deadly force was reasonable at every stage of the encounter, because he reasonably believed that Rucker was attempting to use his vehicle as a weapon and a reasonable police officer on the scene would have believed that the popping sound caused by the exploding transformer box was a gunshot coming from Rucker's position. Dkt. # 78, at 23-27. Plaintiff responds that Mortensen's decision to open to door of Rucker's vehicle while pointing a firearm at him with the other hand was reckless and immediately escalated the danger to all involved in the encounter. Dkt. # 96, at 21. Plaintiff also argues that Mortensen could not reasonably have believed that he was in danger as Rucker attempted to flee in his vehicle or after Rucker crashed his vehicle, and Mortensen's decision to use deadly force was unreasonable under the circumstances. Dkt. # 96, at 22-26.

Mortensen and Snyder made contact with Rucker at the parking lot of the OYO Hotel on November 5, 2020, and the situation rapidly escalated into a violent encounter in which both officers believed that the use of deadly force was necessary. Mortensen and Snyder had received information from Rucker's neighbor that Rucker had been seen driving a red pickup truck, and they observed a red pickup truck in the parking lot of the OYO Hotel. Mortensen approached the red pickup truck immediately upon getting out of the patrol vehicle, and approximately five seconds elapsed from the time that Mortensen stepped out of the patrol car until he opened the door of the red pickup truck. Dkt. # 82-19, at 0:09-0:14. Mortensen and Snyder did not activate the lights on their patrol vehicle to signal that they were initiating an investigative detention or arrest, because they were not sure if Rucker was the occupant of the pickup truck. Mortensen was able to identify Rucker as the occupant of the pickup truck as he walked towards it, and he believed that it was "urgent" for him to arrest

11

Rucker. Dkt. # 82-1, at 27. Mortensen opened the door of the pickup truck with his left hand while he pointed his firearm at Rucker with his right hand, and he announced that Rucker was under arrest. Rucker immediately shifted into reverse and drove backwards directly into the parked patrol vehicle. After crashing into the parked patrol vehicle, Rucker began to drive forward in the general direction of Mortensen and Mortensen fired three shots at Rucker as he drove toward and slightly past him. Mortensen was not directly in the path of Rucker's vehicle when he shot at Rucker, as he had walked toward his left after Rucker crashed into the patrol car, but Rucker turned hard to the left away from Mortensen after initially driving in the direction of Mortensen. Rucker drove away from Mortensen and Snyder along the wall of the hotel until he crashed into a transformer box, and Mortensen heard a popping sound come from near the location of Rucker's vehicle. Mortensen called out "shots fired" after hearing the popping sound, and both Snyder and Mortensen sought cover. Snyder sent out a dispatch call reporting that a suspect had fired at officers and was in possession of a pistol, even though neither Snyder nor Mortensen had seen Rucker in possession of a pistol. Mortensen filed multiple rounds at Rucker and had to reload his firearm in order to continue shooting. Dkt. # 82-19, at 0:32-1:05. Mortensen stayed behind a stairwell while the other officers prepared to approach Rucker's position.

The Court will consider the Graham factors to determine whether Mortensen engaged in the use of excessive force in violation of Rucker's Fourth Amendment rights. The Court will also take into account the four factors from Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255 (10th Cir. 2008), to evaluate the "degree of threat perceived by [Mortensen]." See Estate of Taylor v. Salt Lake City, 16 F.4th 744, 765 (10th Cir. 2021) (the totality of the circumstances analysis requires

consideration of the <u>Graham</u> and <u>Larsen</u> factors in excessive force cases).  The four non-exclusive <u>Larsen</u> factors include:

> (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands, (2) whether any hostile motions were made with the weapon towards the officers, (3) the distance separating the officers and the suspect, and (4) the manifest intentions of the suspect."

<u>Estate of Larsen</u>, 511 F.3d at 1260.

The first <u>Graham</u> factor is the severity of the crime at issue, and Mortensen had knowledge of multiple potential offenses committed by Rucker prior to the inception of the encounter at the OYO Hotel on November 5, 2020.  Mortensen initially encountered Rucker in the parking lot of the OYO Hotel on November 4, 2020, and Rucker eluded arrest in a high speed chase while potentially in possession of a stolen vehicle.  Another police officer, McCasland, was investigating the car theft the day before Rucker was killed, and McCasland observed Rucker sitting in a vehicle with a semi-automatic pistol.  Subsequent investigation confirmed the Rucker had prior felony convictions, and he could not lawfully possess a firearm.  Mortensen had knowledge of multiple felony offenses for which Rucker could be arrested, including eluding an officer, possession of a stolen vehicle, and possession of a firearm after former felony conviction.  OKLA. STAT. tit. 21, § 540A (eluding arrest in a manner that endangers other people is a felony); OKLA. STAT. tit. 21, § 1283(A) (felony offense for any person previously convicted of a felony to possess a firearm); OKLA. STAT. tit. 47, § 4-103 (classifying unlawful possession of a stolen vehicle as a felony offense).  Considering these offenses collectively, Mortensen could reasonably have believed that Rucker posed a risk to public or officer safety prior to the inception of the encounter.

13

Rucker was clearly attempting to flee or resist arrest at the time Mortensen fired the first shots toward Rucker's vehicle, and the third <u>Graham</u> factor (attempting to flee or resist arrest) weighs in favor of Mortensen. Plaintiff argues that Mortensen caused Rucker to panic by opening the door of the vehicle and pointing a gun at Rucker, but this does not change the fact that Rucker was attempting to flee the scene in his vehicle. The Court will consider plaintiff's argument concerning the reasonableness of the manner in which Mortensen initiated the encounter when analyzing the second <u>Graham</u> factor, but the evidence plainly establishes that Rucker was attempting to flee or resist arrest.

The second <u>Graham</u> factor (immediate threat to safety of officers or others) is the most significant factor in determining the reasonableness of a police officer's conduct. <u>Alcala v. Ortega</u>, 128 F.4th 1298, 1313 (10th Cir. 2025); <u>Estate of Taylor</u>, 16 F.4th at 762-63. Due to the length of the encounter, the Court will not simply consider the second <u>Graham</u> factor in light of the entire incident. Instead, the Court will consider the application of the second <u>Graham</u> factor based on the inception of the attempted arrest of Rucker and the events following the vehicular crash separately.

Plaintiff argues that the conduct of Mortensen was unreasonable from the beginning of the encounter with Rucker, and he claims that Mortensen immediately escalated the danger to all involved by opening the door of Rucker's vehicle while holding a firearm in his other hand.[4] The former chief of TPD, Wendell Franklin, testified in his deposition that TPD officers have now been trained not to open the door of a vehicle while simultaneously pointing a firearm at a suspect,

---

[4]    Plaintiff argues that Rucker was "understandably fearing for his life," and attempts to explain Rucker's subsequent conduct based on Rucker's subjective reaction to the manner in which Mortensen opened the door. Dkt. # 96, at 21. The Court will not speculate as to Rucker's subjective feelings or fears in this or any other context in this Opinion and Order, as this would be purely speculative and without evidentiary basis.

because this increases the likelihood that officer will be required to use deadly force. Dkt. # 96-9, at 28-30. Tenth Circuit precedent requires this Court to consider whether a police officer unreasonably created a need to use deadly force by engaging in reckless conduct. Arnold v. City of Olathe, Kansas, 35 F.4th 778, 790 (10th Cir. 2022). Based on Rucker's prior conduct and his criminal record, Mortensen and Snyder could have reasonably perceived that there would be a risk that Rucker would attempt to flee and that he could have been in possession of a firearm. The Court does not go as far as to suggest that Mortensen's decision to open the door of the vehicle while pointing a firearm at Rucker was objectively reasonable, but the Court also cannot conclude that it was reckless under the circumstances.

The parties dispute whether Mortensen reasonably believed that he was in immediate danger after Rucker crashed his vehicle into the patrol car and began to drive forward in the general direction of Mortensen. Plaintiff claims that Mortensen voluntarily placed himself in front of Rucker's vehicle as it pulled away from the patrol car, and he argues that Rucker did not intentionally drive toward Mortensen. Dkt. # 96, at 21-22. Body camera footage shows Mortensen moving to his left as Rucker began to drive forward, but Mortensen could not immediately have known that Rucker was going to turn to his left and drive past Mortensen. Dkt. # 82-19, at 0:19-0:21. Mortensen fired three shots as Rucker drove past his position and continued along the outside wall of the hotel. Dkt. # 82-1, at 42-46. Plaintiff cites Zia Trust Co. ex rel. Causey v. Montoya, 597 F.3d 1150 (10th Cir. 2010), in which police officers responded to a domestic violence call and they observed the suspect behind the wheel of van that was stuck on a pile of rocks. Id. at 1153. Officer Carlos Montoya approached the van with his weapon drawn, failed to identify himself as a police officer, and stood in a dark area directly in front of where the wheels of the van were pointed. Id.

15

The driver revved the engine of the van and it moved forward about one foot, and Montaya fired a single shot that later resulted in the driver's death. Id. The Tenth Circuit noted that evidence concerning what actually occurred was "hotly disputed," and the Tenth Circuit was required to rely on the plaintiff's version of the events due to a lack of video evidence. Id. at 1154-55. Based on solely on the plaintiff's evidence, the Court determined that Montoya lacked any basis to perceive a risk that the driver would use the vehicle as a weapon, because Montoya was a safe distance from the vehicle and it was unable to move. Id. at 1155. In this case, Rucker had backed his vehicle into a patrol car, but his vehicle was not stuck and the wheels were pointed in Mortensen's direction as it began to speed up. Rucker was plainly attempting to evade arrest and his behavior showed that he had no intention of obeying any command given by Mortensen or Snyder. A reasonable officer in Mortensen's position could have believed that Rucker would use his vehicle to injure or attempt to injure Mortensen, and Mortensen's decision to use deadly force to defend himself was reasonable. Carbajal v. City of Cheyenne, Wyoming, 847 F.3d 1203 (10th Cir. 2017) (police officer acted reasonably by shooting at suspect behind the wheel of vehicle when the suspect was evading arrest, ignoring officer commands, and was driving toward a police officer).

Plaintiff asks the Court to make a distinction between shots fired by Mortensen as the vehicle was headed toward him and shots that Mortensen fired as Rucker drove away before crashing into the transformer box. Dkt. # 96, at 23. Mortensen contends that he was justified in firing additional shots as Rucker fled the scene, because the threat to public safety had not ended and it was reasonable for him to continue to use deadly force until the threat had abated. Dkt. # 78, at 25. The Court has reviewed the video footage and it took approximately four seconds from the time the vehicle began to accelerate towards Mortensen and when the vehicle crashed into the transformer

box.  Dkt. # 82-4, at 0:07-0:11 (Mortensen's body camera footage).  The video footage does not clearly show how many shots were fired during these four seconds, but the threat to public safety was ongoing as Rucker drove next to the outside wall of the hotel.  Plaintiff argues that Mortensen had "time to assess the situation" and stop shooting, but this argument is based on plaintiff's slow-motion review of the video evidence and does not take into account how a reasonable officer under the circumstances would have reacted.

The Larsen factors also support Mortensen's belief that Rucker posed a serious threat to police officers at the early stages of the encounter.  The first Larsen factor (command to drop weapon) is not directly applicable.  Mortensen did not order Rucker to drop a weapon when he opened the door of Rucker's vehicle, because there is no evidence that Mortensen saw Rucker in possession of a weapon.  However, Mortensen did tell Rucker that he was under arrest as soon as he opened the door.  Rucker plainly engaged in a hostile movement toward Mortensen by attempting to flee in his vehicle and placing Mortensen in danger of being struck by the vehicle as Rucker attempted to escape, and the second Larsen factor weighs in favor of Mortensen.  The third Larsen factor (distance between officer and suspect) also weighs in favor of Mortensen, as there was very little distance between Rucker and Mortensen after Mortensen opened the door of the vehicle and Rucker attempted to flee.  Mortensen also could have reasonably believed that Rucker intended to flee and use his vehicle as a weapon to harm Mortensen or Snyder, and the fourth Larsen factor (manifest intentions of the suspect) strongly supports Mortensen's use of force at the initial stage of the encounter with Rucker.

17

Plaintiff argues that each shot taken by Mortensen after Rucker crashed into the transformer box was a violation of Rucker's constitutional rights.[5] Dkt. # 96, at 24. Plaintiff disputes that the "loud bang" heard on the video footage could have sounded like a gunshot to a reasonable police officer. Id. Even if it could have sounded like a gunshot, plaintiff argues that Mortensen had ample time to take cover and assess the situation before he continued shooting at Rucker. Id. at 25. Mortensen did not hear any additional sounds that could have been a gunshot and he could see Rucker lying on the ground under the truck, and plaintiff contends that it was unreasonable for Mortensen to believe that Rucker was in possession of a firearm based on the events of the police encounter with Rucker on November 4, 2020. Plaintiff asks the Court to consider the Larsen factors to assess whether Rucker could reasonably be considered a threat to the police officers following the vehicle crash. Id. at 26. Mortensen responds that he heard a sound that could reasonably have sounded like a gunshot, and he continued to see smoke emanating from the truck making him believe that Rucker was continuing to shoot at the police officers. Dkt. # 78, at 26. He claims that he heard Snyder repeatedly ordering Rucker to "drop the gun" and, based on his encounter with Rucker the previous day, he reasonably believed that Rucker actually had a gun.[6] Mortensen also asserts that

---

[5]    The Court will separately evaluate the Graham and Larsen factors from the point of the encounter after Rucker crashed his vehicle into the transformer box. However, the first and third Graham factors are essentially the same throughout the encounter, and the Court will provide additional analysis of the second Graham factor only.

[6]    Mortensen states that a firearm was found in Rucker's vehicle on November 6, 2020, and he suggests that Rucker may actually have been in possession of a firearm when he was shot and killed on November 5, 2020. Dkt. # 78, at 26. Plaintiff remarks that the firearm was "miraculously found" the next day and implies that the firearm was planted in the vehicle the next day. Dkt. # 96, at 26 n.3. For the purpose of this Opinion and Order, the parties have presented no evidence that Rucker was in possession of a firearm while he was on the ground next to the truck, and there is no evidence that he actually fired a shot at police officers on November 5, 2020. There is also no evidence that police subsequently planted a firearm in

18

he believed that it was necessary to use deadly force in order to prevent Rucker from moving into a better location to fire on himself and Snyder. Id.

Mortensen initially acted reasonably by taking cover after hearing a popping sound that he mistakenly believed was the discharge of a firearm, but it became unreasonable for him to continue firing at Rucker based on the explanation he has provided for his actions. Mortensen argues that his decision to continue firing at Rucker was reasonable based on his knowledge that Rucker was found in possession of a handgun on November 4, 2020, Rucker's criminal history, and Rucker's actions on the day of the shooting. Dkt. # 78, at 26. He contends that he was making a split-second decision in a rapidly evolving situation in which he believed Rucker had already fired a shot, and he did not have to wait for Rucker to fire at him before continuing to use deadly force. Id. at 27. However, Rucker had just been involved in a serious automobile accident and he had likely been shot several times prior to the crash, and Mortensen could see Rucker laying underneath the vehicle. Police officers heard no further sounds that could reasonably have been perceived as gunfire coming from Rucker's position, and they could not see a firearm in Rucker's possession or near his person. Mortensen argues that police officers do not have to wait for a person they reasonably believe to be armed to start shooting at them before making the decision to use deadly force, and the choice to use deadly force can be reasonable even if the police officer is ultimately mistaken in his belief that a suspect was armed. Dkt. # 78, at 27 (citing Phillips v. James, 422 F.3d 1075, 1084 (10th Cir. 2005)). Neither Mortensen nor Snyder was in an exposed position at this point in the encounter, and they had no need to make a split-second decision as to whether to immediately use force to protect

---

Rucker's vehicle, and the Court further rejects plaintiff's arguments that this issue could be part of his argument should the case proceed to trial.

themselves. Mortensen claims that he believed Rucker intended to move into a more advantageous position to fire at the police officers, but Rucker never moved or showed any sign of getting up from underneath the vehicle. Viewing the evidence in a light most favorable to plaintiff, the Court does not find that Mortensen could have perceived that Rucker was armed or posed a significant threat to officers following the vehicular crash, and the second Graham factor weighs in favor of plaintiff.

The Court must also consider the Larsen factors to evaluate the degree of threat posed by Rucker at this stage of the encounter. The first and second Larsen factors (orders issued to suspect and hostile movements) do not clearly show that officers reasonably perceived that Rucker presented a serious risk of danger to them. Mortensen did not issue any commands to Rucker as he continued to fire towards the scene of the crash, but Snyder was repeatedly ordering Rucker to "stop moving" and "drop the gun." Mortensen states that he could see Rucker moving underneath the vehicle, and he heard Snyder ordering Rucker to "drop the gun," "stop moving," and "[s]uspect's still reaching." Dkt. # 82, at 12. It appears that Mortensen relied on the popping sound and Snyder's statements to form a belief that Rucker's movements were hostile and that Rucker was reaching for a firearm. However, Mortensen clearly states that he could see Rucker and he does not state that he actually observed Rucker in possession of a firearm. The third Larsen factor (distance between suspect and police) is neutral, as Rucker was approximately 20 to 25 yards from Mortensen's position and Rucker did not substantially change positions after the vehicular crash. As to the final Larsen factor (manifest intentions of the suspect), it is clear that Mortensen subjectively believed that Rucker had or intended to possess a firearm and that Rucker wanted to move into a more advantageous position to fire on the police officers. At best, the objective evidence available to a police officer in Mortensen's position suggests that there is a legitimate basis to dispute the conclusion reached by

20

Mortensen, and the evidence does not show that Mortensen actually saw Rucker in possession of a firearm or that Rucker made any attempt to move to another position to fire on police officers.

The Court finds that there are genuine disputes as to material facts that, if viewed in favor of plaintiff, call into question whether it was reasonable for Mortensen to continue firing at Rucker after he heard the popping sound and took cover behind the stairwell. Mortensen heard a pop or bang come from the location of Rucker's vehicle, and the Court will assume that a police officer could have reasonably but mistakenly believed the sound was a gunshot. Mortensen found a covered position behind a stairwell, and it is not clear that he was in immediate danger from being shot even if Rucker had actually been in possession of a firearm. The video footage does not clearly show Rucker underneath his vehicle following the accident, and the Court cannot verify whether Mortensen could reasonably have believed that Rucker was reaching for a weapon. In any event, there were no additional sounds coming from Rucker's position and there was no basis for officers to believe that Rucker had discharged a firearm after Mortensen heard the initial popping sound caused by the exploding transformer box. A reasonable jury could conclude that Rucker no longer posed a threat to police officers while he was laying under his vehicle following the accident and Mortensen's decision to use deadly force violated Rucker's constitutional rights.

Plaintiff has the burden to establish that the constitutional right violated by Mortensen was clearly established when the shooting took place. Ibarra v. Lee, 135 F.3d 1257, 1260 (10th Cir. 2024); Frasier v. Evans, 992 F.3d 1003, 1021 (10th Cir. 2021). The Tenth Circuit has explained that law is clearly established if the contours of a constitutional right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Perry v. Durborow, 892 F.3d 1116, 1123 (10th Cir. 2018). The contours of a right are generally "sufficiently clear" only

if the plaintiff "identif[ies] an on-point Supreme Court or published Tenth Circuit decision" or "shows 'the clearly established weight of authority from other courts [has] found the law to be as plaintiff maintains . . . .'" Id. District courts have been cautioned not to define a constitutional right "at a high level of generality" but, instead, "the clearly established law must be 'particularized' to the facts of the case." Id. To find that the law is clearly established, the district court must "identify a case where an offic[ial] acting under similar circumstances as [defendant]" was held to have violated the constitutional right at issue. Id. at 1124.

The ultimate question is whether a reasonable police officer would have understood that the amount of force used was not justified, and the Court must view the disputed facts in a light most favorable to plaintiff when making this determination. The Court's inquiry is limited to the portion of the encounter following the vehicular crash and the popping sound emanating from the transformer box.[7] Plaintiff relies on Fancher v. Barrientos, 723 F.3d 1191 (10th Cir. 2013), to show that a reasonable police officer could not believe that it was necessary to use deadly force against a suspect who had already been shot and no longer posed any danger to the police officer. Dkt. # 96, at 29. In Fancher, a police officer involved in dangerous physical altercation with a suspect fired a single shot while the suspect was attempting to flee in the police officer's patrol vehicle. Fancher, 723 F.3d at 1196. The shot struck the suspect in the chest and the suspect slumped over, but the patrol car continued to roll backwards at a slow speed. Id. at 1197. After five to seven seconds, the

---

[7]    Plaintiff relies heavily on Cordova v. Aragon, 569 F.3d 1183 (10th Cir. 2009), in an attempt to show that it is clearly established that a police officer may not fire at a suspect fleeing in a vehicle when the suspect's flight did not place the officer or public in any danger. The Court has determined that Rucker's attempt to flee caused Mortensen to reasonably believe that he was in danger, and this aspect of the case is not at issue for the determination of whether the law giving rise to a constitutional violation was clearly established.

police officer fired six more shots at the suspect as the patrol vehicle rolled backwards, even though the police officer was not in any immediate danger from the vehicle and the suspect was injured and unarmed.  Id.  The district court found that the police officer acted reasonably by firing the first shot at an actively resisting suspect, but the police officer used excessive force by firing six additional shots when he was no longer in danger and the suspect posed no risk of harm to the officer or the public.  Id. at 1198.  The district court relied on Thomas v. Durastanti, 607 F.3d 655 (10th Cir. 2010), for the proposition that "circumstances may change within seconds eliminating the justification for deadly force," and the Tenth Circuit affirmed the district court's decision to consider the reasonableness of the use of force at different stages of the encounter.  Fancher, 723 F.3d at 1199-1200.  The Tenth Circuit lacked jurisdiction to consider factual challenges to the district court's order, and it found that the law was clearly established that firing six shots at a suspect who was unable to flee and posed no risk of harm to the police officer violated the suspect's clearly established rights.

The Court finds that Fancher is sufficiently clear and on-point that a reasonable police officer would know that continuing to fire at an unresisting and unarmed suspect violated the suspect's clearly established constitutional rights, even in a situation when the police officer's initial use of deadly force was constitutionally reasonable.  Plaintiff has met his burden to show that Mortensen violated Rucker's constitutional rights and that the law giving rise to the constitutional violation was clearly established when the incident occurred.  Therefore, Mortensen is not entitled to qualified immunity and his motion for summary judgment (Dkt. # 78) is denied.

**C.**

Snyder argues that his decision to use deadly force was reasonable at every stage of the encounter with Rucker, and he asks the Court to find that he has qualified immunity from suit. Dkt. # 79, at 7-9. Plaintiff responds that Rucker was not in possession of a firearm, nor could Snyder have reasonably believed at any point in the encounter that Rucker was reaching for a firearm, and he argues that every shot fired by Snyder constitutes the use of excessive force. Dkt. # 97, at 19-24.

As with Mortensen's motion for summary judgment, the Court will separately consider Snyder's action leading up to the vehicular crash and his use of force while Rucker was lying on the ground following the crash. Snyder argues that he reasonably believed that it was necessary for him to use deadly force during the initial part of the encounter, because Rucker's actions in driving toward Mortensen created a risk of harm to another officer. The Court has already determined that Mortensen could have reasonably believed that Rucker intended to use his vehicle to injure Mortensen, and this finding also supports Snyder's argument that he could have perceived an objective risk that Rucker's actions were threatening the safety of another officer. Snyder had moved into a position near the parked patrol vehicle and was not in imminent danger as Rucker's vehicle began to drive away from the officers. Dkt. # 82-19, at 0:20-0:22. However, Mortensen was at risk from being injured by Rucker's vehicle or at least Snyder perceived a risk of harm to Mortensen due to the uncertainty as to which direction Rucker would drive as he attempted to flee.

The Court's analysis of the Graham and Larsen factors as to Mortensen is equally applicable to Snyder's conduct leading up to the vehicular crash, and the Court finds that Snyder reasonably believed that it was necessary to use deadly force to protect the safety of another officer. The beginning of the encounter was a rapidly evolving situation in which Rucker was evading arrest and

potentially using his vehicle as a weapon to harm Mortensen, and the "calculus of reasonableness" must take into account the short time frame in which Snyder had to make a decision concerning the use of force. Alcala, 128 F.4th at 1307 (courts can consider how quickly the situation was unfolding to evaluate the reasonableness of an officer's conduct"). Plaintiff complains that Snyder continued to fire shots after Rucker had already driven past Mortensen's position and Rucker no longer posed a risk of harm to anyone as he attempted to drive away from the scene of the attempted arrest. Dkt. # 97, at 20. However, Snyder fired at Rucker as he drove toward Mortensen and as Rucker continued to drive away, and the part of encounter last approximately four seconds. Rucker's vehicle remained in Mortensen's immediate vicinity while Snyder was firing during the initial stage of the encounter, and plaintiff's argument fails to take into the account the speed at which events were occurring. Rucker's actions would have caused a reasonable police officer to believe that Mortensen was in danger and that it was necessary to use force to protect a fellow officer.

The parties dispute whether Snyder's belief that he saw Rucker holding or reaching for a gun following the crash was reasonable, even if Snyder was ultimately mistaken in his belief that Rucker actually had a gun at some point during the encounter. Snyder's alleged observation of a firearm in Rucker's possession or near his person was the primary factor supporting the continued use of force against Rucker while he was lying under the truck, as Snyder repeatedly called out that Rucker was reaching for a gun and he would fire at Rucker after ordering him to "drop the gun." The Court will consider only the information available to Snyder at the time of the vehicular crash and his observations immediately following the crash, and the fact that Rucker was not later found in possession of a firearm is not relevant to the Court's analysis of the reasonableness of Rucker's conduct. Hemry v. Ross, 62 F.4th 1248, 1257-58 (10th Cir. 2023) ("The reasonableness of a

25

particular use of force must be judged from the perspective of a reasonable officer on the scene, rather that with tht 20/20 vision of hindsight).

A reasonable officer on the scene would have been in possession of some information causing him to believe that Rucker could have been armed when police made contact with him, but the Court must assess whether this belief would have reasonable as the encounter with Rucker progressed. Snyder was aware that McCasland had observed Rucker in possession of a firearm the previous day, and they also knew that Rucker had prior violent felonies, including a charge for illegally possessing a firearm. Snyder and Mortensen could have reasonably believed that it was necessary to take precautions for their own safety when making contact with Rucker. Rucker immediately backed his vehicle into the nearby patrol car soon as Mortensen opened the car door, and Mortensen did not have time to assess whether Rucker was presently carrying or had access to a firearm. However, Mortensen also did not observe Rucker in possession of a firearm during their limited interaction at the beginning of the encounter. After Rucker drove away from the officers' position, he crashed into a transformer box and Mortensen called out "shots fired" after hearing a popping sound caused by the transformer box. The officers' body camera footage does not show Rucker while he was under the truck following the accident, but Snyder continued to call out that Rucker was reaching for a gun and "drop the gun" while he fired at Rucker. Snyder testified in his deposition that he saw an object in Rucker's hand that he believed was a firearm, and he continues to believe that Rucker may have been in possession of a firearm while he was lying under the truck. Dkt. # 96-5, at 9-10, 17.

Viewing the evidence in a light most favorable to the non-moving party, the Court finds that there is a genuine dispute as to whether a reasonable police officer could have believed that Rucker

was in possession of a firearm while he was lying under the truck following the accident.[8] Mortensen and Snyder had information suggesting that Rucker could be armed, but this does not mean they could assume as the encounter progressed that Rucker actually had a firearm based only on their prior suspicions. Snyder did hear a popping sound after Rucker's vehicle crashed into the transformer box, but there were no other indications from Rucker's position that he had actually fired at Mortensen or Snyder. Snyder acted reasonably by taking cover immediately after the crash and hearing a popping sound, but the encounter continued for a substantial amount of time and there is no evidence that Snyder reassessed whether Rucker was still in possession of a firearm while he was under the truck. Snyder continues to assert that he did see Rucker in possession of an object that could have been a firearm, and he suggests that Rucker placed the firearm in his vehicle before he died. Dkt. # 95-5, at 9-10. However, DeGeorge and Myers both testified that they did not see a gun or any other object near Rucker, and they were relying solely on Snyder's belief that he had seen a gun as a basis to use deadly force against Rucker. Dkt. # 96-10, at 7; Dkt. # 91-11, at 2. The Court finds that there is a genuine dispute concerning whether Snyder actually observed Rucker in possession of a firearm or an object that appeared to be a firearm. The Court also notes that Snyder was in a covered position behind a patrol vehicle, and neither he nor Mortensen were in any immediate danger from being shot even if Rucker had a firearm. Considering the totality of the circumstances, a jury could find that Snyder lacked a reasonable basis that Rucker was armed or posed any danger to the officers while he was lying under the truck.

---

[8]     As with Mortensen's motion for summary judgment, the first and third Graham factors remain essentially unchanged throughout the encounter, and the Court will evaluate the second Graham factor and the Larsen factors from Snyder's perspective for events following the crash of Rucker's vehicle into the transformer box.

The evidence in the summary judgment record, viewed in a light most favorable to the non-moving party, does not support a finding that a reasonable police officer could have perceived that Rucker posed an immediate threat to the safety of the police officers, and the second Graham factor weighs in favor of plaintiff's claim that police officers used excessive force. The Larsen factors viewed from Snyder's perspective also do not suggest that Rucker posed an elevated threat level to Snyder or Mortensen following the vehicular crash. The first and second Larsen factors (commands issued to suspect and hostile movements by suspect) do not weigh in favor of Snyder based on the genuine dispute of material fact as to whether Rucker was in possession of a firearm. It is undisputed that Snyder was commanding Rucker to "drop the gun" and "stop moving," but it was arguably impossible for Rucker to comply with Snyder's commands. Snyder perceived Rucker's movements as hostile as he was allegedly reaching for an object, but Rucker had likely been shot several time by this point in the encounter and it is unclear if Snyder considered whether Rucker's alleged hand motions were voluntary or involuntary. A jury could reasonably conclude that Rucker had no ability to comply with Snyder's commands and that Snyder's perception of a threat based on Rucker's movements was unreasonable. The third Larsen factor (distance between suspect and police officers) is neutral. Rucker was approximately 20 to 25 yards from Snyder, which was well within the range of a firearm, but Snyder was in a covered position and in no immediate danger. The final Larsen factor (manifest intentions of suspect) must be considered in light of the disputed evidence concerning whether Snyder could reasonably have perceived Rucker's movements as hostile or threatening. Snyder believed that Rucker was reaching for a firearm and Snyder claims that he saw a firearm near Rucker, but no other police officer on the scene personally observed Rucker in possession of a firearm. Rucker also did not substantially move from his position

underneath the truck, and he was no longer attempting to escape or move into a position to fire on police officers. The evidence viewed in light most favorable to plaintiff does not support a finding that Rucker's actions would have indicated that he intended or was even capable of harming Snyder or Mortensen following the vehicular crash.

Considering the Graham and Larsen factors, the Court finds that there are genuine disputes as to material facts concerning the reasonableness of Snyder's belief that Rucker was armed and that Rucker posed any danger to police officers following the vehicular crash. A jury could conclude that Snyder's decision to continue to use deadly force at this stage of the encounter was excessive and unreasonable, and plaintiff has met his burden to show that Snyder violated Rucker's constitutional rights. Plaintiff has also shown that the law giving rise to the constitutional violation was clearly established when the incident occurred. Plaintiff relies on Fancher and several other cases for the proposition that the continued use of deadly force against Rucker after the vehicular crash was unreasonable when Rucker no longer had control of the vehicle and did not pose any threat to Snyder or Mortensen. See Clerkly v. Holcomb, 121 F.4th 1359, 1367 (10th Cir. 2024) ("It was therefore clear in 2019 that an officer responding to a potentially dangerous situation could not use deadly force against an unarmed, nonthreatening person"); Zia Trust Co. ex rel. Causey, 597 F.3d at 1155 (law is clearly established that using deadly force against a suspect who posed no immediate threat to police officers violates the Fourth Amendment). There are several key facts can that cannot be resolved in Snyder's favor on a motion for summary judgment and it is not clear that Rucker posed a continued threat to Snyder after the vehicular crash, and a reasonable police officer in November 2020 would have been aware that it was unconstitutional to continue use deadly force against a

suspect who posed no risk of harm to police officers.  Therefore, Snyder is not entitled to qualified immunity and his motion for summary judgment (Dkt. # 79) is denied.

**D.**

DeGeorge and Myers argue that they have qualified immunity from suit, because there is no evidence that they violated Rucker's constitutional rights by firing a small number of shots based on information provided by other officers that Rucker was armed and had fired at Snyder and Mortensen.  Dkt. # 77, at 7-8; Dkt. # 80, at 7-8.  Even if a constitutional violation occurred, DeGeorge and Myers contend that plaintiff cannot meet his burden to show that the law giving rise to a violation of Rucker's constitutional rights was clearly established.  Dkt. # 77, at 21-22; Dkt. # 80, at 23-24.  Plaintiff responds that DeGeorge and Myers lacked personal knowledge of the events leading up to crash of Rucker's vehicle into the transformer box, and Rucker did not pose a threat to anyone by the time DeGeorge and Myers arrived on the scene.  Dkt. # 98, at 10-11; Dkt. # 99, at 10-11.  Plaintiff further argues that a reasonable police officer would have understood at the time of the incident that clearly established law prohibited police officers from firing at an injured and unarmed suspect who was not in a position to harm police officers or anyone else.  Dkt. # 98, at 15-16; Dkt. # 99, at 14.

The parties do not dispute that DeGeorge and Myers arrived at the OYO Hotel after Mortensen and Snyder had already begun shooting at Rucker, but the parties substantially disagree about what DeGeorge and Myers already knew before they arrived and what a reasonable police officer would have perceived at the scene.  The summary judgment record includes declarations from DeGeorge and Myers in which they state they learned earlier in the day on November 5, 2020 that Mortensen had been involved in an unsuccessful pursuit of a stolen Chevy Tahoe on November 4,

30

2020 and that Rucker was the driver of the stolen vehicle.  Dkt. # 82-14, at 1; Dkt. # 82-20, at 1.

DeGeorge and Myers went to Rucker's residence on November 5, 2020 and observed a stolen

vehicle in front of the residence.  Id.  DeGeorge and Myers learned of McCasland's report that

Rucker had been seen with a firearm on November 4, 2020, and they also became aware of Rucker's

criminal history before they arrived at the OYO Hotel on November 5, 2020. Dkt. # 82-14, at 2; Dkt.

# 82-20, at 2.  DeGeorge and Myers both state that had already decided to go to the OYO Hotel prior

to receiving a call of shots fired from Mortensen and Snyder, and they were just a few blocks away

from the OYO Hotel when they heard that shots had been fired at the OYO Hotel.  Id.

Both DeGeorge and Myers were holding AR-15 assault rifles as their patrol car stopped at

the OYO Hotel, and they encountered Snyder firing at Rucker's position and ordering him to stop

moving.  Dkt. # 82-19, at 55:00-1:00:15.  DeGeorge took a position to the left of Snyder next to his

patrol car, and Myers subsequently joined DeGeorge after initially moving to the right side of the

partol car.  Id. at 59:00-1:07:00.  DeGeorge claims that he heard a "pop" and saw a flash coming

from Rucker's vehicle, and he believed that this was a "muzzle flash" caused when Rucker fired at

police officers.  Dkt. # 82-14, at 2.  Body camera footage does show a puff of smoke coming from

Rucker's vehicle immediately after Mortensen fired a shot towards Rucker, but the "pop" heard by

DeGeorge was most likely caused by Mortensen's firearm.  Dkt. # 82-19, at 54:00-56:06.  There is

no evidence that DeGeorge communicated to Myers or any other police officer that he believed that

Rucker had just discharged a firearm.  Snyder clearly advised DeGeorge and Myers that Rucker had

fired at himself and Mortensen, and Snyder continued to fire at Rucker while simultaneously telling

DeGeorge and Myers that Rucker was reaching for a gun.  Id. at 1:03-1:07.  DeGeorge and Myers

each fired two shots at Rucker during the encounter, and Myers states that he fired his final shot

when he saw Rucker reaching his hand toward the spot that Snyder had indicated a firearm was located. Dkt. # 82-14, at 5; Dkt. # 82-20, at 4-5.

The parties dispute whether DeGeorge's and Myer's decision to use deadly force constituted the use of excessive force, and they offer competing applications of the Graham factors based on substantially divergent views of the encounter. To show that the amount of force used was excessive, plaintiff must "demonstrate the officers' actions were objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation," and the reasonableness of the officers' actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Cruz v. City of Deming, 138 F.4th 1257, 1266 (10th Cir. 2025). DeGeorge and Myers were not present from the beginning of the encounter with Rucker, and much of the information they had about Rucker's conduct and the risk he posed to police officers came from Snyder and Mortensen. Tenth Circuit precedent clearly allows a police officer to take into account information provided by another officer when engaging in conduct under the Fourth Amendment, as long as the decision to rely on the information was objectively reasonable. Felders ex rel. Smedley v. Malcom, 755 F.3d 870, 882 (10th Cir. 2014).

Plaintiff suggests that DeGeorge and Myers believed that it was reasonable for them to fire at Rucker merely because Mortensen and Snyder were shooting at Rucker when DeGeorge and Myers arrived on the scene. Dkt. # 98, at 12  The Court agrees that it would likely be a violation of Rucker's constitutional rights if that had been the basis for DeGeorge and Myers to use deadly force, but neither DeGeorge nor Myers argues that another officer's use of deadly force authorized them to engage in similar conduct. Instead, DeGeorge and Myers are arguing that their decision to use

32

deadly force was reasonable under the totality of the circumstances, including the mistaken but reasonable belief that Rucker had fired at Mortensen and Snyder, and that Rucker was actively in possession of a firearm when they arrived on the scene. The Court will consider all of the information known to DeGeorge and Myers when they arrived on the scene, including any information provided by Snyder or Mortensen, to determine whether their deadly force was reasonable under the Fourth Amendment.

The first Graham factor (severity of the crime) weighs in favor of DeGeorge and Myers, because Rucker was suspected of committing multiple felony offenses. Vette v. K-9 Unit Deputy Sanders, 989 F.3d 1154, 1170 (10th Cir. 2021) (even non-violent felony offenses weigh in favor of police officers who used force). DeGeorge and Myers were aware of Rucker's criminal history and knew that he had been found in possession of a firearm on November 4, 2020. OKLA. STAT. tit. 21, § 1283(A) (felony offense for any person previously convicted of a felony to possess a firearm). They were also aware that Rucker had eluded arrest in a manner potentially dangerous to police officers or the public on November 4, 2020, and Rucker engaged in similar conduct on November 5, 2020 when he attempted to flee from the OYO Hotel. OKLA. STAT. tit. 21, § 540A (eluding arrest in a manner that endangers other people is a felony). The Court notes that the first Graham factor is not the most significant of the three and will not independently justify the use of force if outweighed by other factors. Vette, 989 F.3d at 1170 (first Graham factor weighed in favor of police officer but the amount of force was substantially unreasonable under other Graham factors).

The third Graham factor (evading arrest or fleeing) weighs in favor of DeGeorge and Myers. Plaintiff argues that this factor weighs heavily in favor of finding that DeGeorge and Myers used excessive force, because Rucker was lying on the ground and unable to move when they arrived on

33

the scene. Dkt. # 98, at 14; Dkt. # 99, at 13. Plaintiff wholly ignores the fact that Rucker did attempt

to flee and he placed Mortensen in danger by driving toward him when he attempted to flee. Rucker

may not have been actively fleeing when DeGeorge and Myers arrived, but Rucker's attempt to flee

clearly elevated the risk of harm to police officers on the scene at every stage of the encounter.

The second Graham factor (immediacy of threat to officers or public) is the most significant

factor. Plaintiff argues that neither DeGeorge nor Myers could have reasonably believed that Rucker

posed a threat to police officers or any other person while he was unarmed and "writhing in agony"

from multiple gunshot wounds. Dkt. # 98, at 13. DeGeorge and Myers contend that they heard a

call of "shots fired" over the radio and when they arrived Snyder informed them that Rucker was

reaching for a gun. Dkt. # 77, at 16; Dkt. # 80, at 17. They argue that Mortensen and Snyder were

firing at Rucker's vehicle when they arrived, and this reasonably contributed to their belief that

Rucker posed an immediate risk of harm to police officers.

Combined with their knowledge of Rucker's conduct on November 4, 2020, DeGeorge and

Myers argue that they were required to make a split-second decision about whether to use force in

a rapidly evolving situation, and they reasonably, even if mistakenly, perceived that Rucker posed

a substantial threat to police officers. The Court concludes that DeGeorge and Myers reasonably

believed that Rucker had fired at police officers and could still be armed when they arrived on the

scene, even if their belief was ultimately mistaken. DeGeorge and Myers state that they were aware

that Rucker had eluded police and had been found in possession of a firearm on November 4, 2020.

When they arrived at the OYO Hotel, they could clearly observe substantial damage to Mortensen's

and Snyder' patrol car, and the condition of Rucker's vehicle provided obvious evidence that Rucker

had again attempted to evade arrest. DeGeorge and Myers heard the call of "shots fired" over the

radio, and Snyder again informed DeGeorge and Myers that that Rucker had fired at police as they arrived at the scene. Plaintiff argues that Rucker did not have a gun and he was obviously suffering from multiple gunshot wounds, and DeGeorge and Myers had ample time to assess the situation before resorting to deadly force. Dkt. # 98, at 13. A reasonable police officer arriving on the scene in possession of the information already known to DeGeorge and Myers could have perceived an immediate threat, and plaintiff's argument is based on the luxury of hindsight. The second <u>Graham</u> factor weighs in favor of DeGeorge's and Myers' decision to use deadly force.

Consideration of the <u>Larsen</u> factors does not substantially affect the Court's determination that DeGeorge and Myers reasonably perceived Rucker as a serious threat based on the information provided to them by other police officers and their own observations and knowledge. The first and second <u>Larsen</u> factors (commands issued by officers and hostile movements) weigh strongly in favor of DeGeorge's and Myer's belief as backup officers that they were entering a dangerous situation where shots had been fired at a police officer. DeGeorge and Myers could hear Snyder issuing commands to Rucker to "drop the gun" and "stop moving," and they were responding to "shots fired" call over the radio. Both DeGeorge and Myers state that they could see Rucker apparently moving his arm toward an object just out of view, and Snyder advised them that Rucker was reaching for a firearm at that location. Dkt. # 82-14, at 4; Dkt. # 82-20, at 4. DeGeorge and Myers could reasonably rely on the information provided to them and they could have perceived that Rucker initiated a hostile encounter with police officers. The third <u>Larsen</u> factor (distance between suspect and police officers) is neutral, as Rucker remained 20 to 25 yards from police officers at all times and he did not make any attempt to substantially change his position. Finally, the fourth <u>Larsen</u> factor (manifest intentions of the suspect) supports DeGeorge's and Myer's argument that

they perceived Rucker as a substantial threat to the safety of police officers. DeGeorge and Myers had received a call of "shots fired" over the radio, and it was apparent that Rucker crashed his vehicle while attempting to flee from police officers. When they arrived, they were told by Snyder than Rucker had discharged a firearm and was reaching for a firearm that was out of view. They also knew of Rucker's criminal history and the report that Rucker had been in possession of firearm on November 4, 2020, and a reasonable police officer in their position could have perceived that Rucker had hostile intentions toward the police officers attempting to arrest him.

Plaintiff has not established that DeGeorge and Myers violated Rucker's constitutional rights, and DeGeorge and Myers are entitled to qualified immunity from suit. DeGeorge and Myers argue that they would be entitled to qualified immunity even if the Court were to find that they violated Rucker's constitutional rights, because plaintiff has not met his burden to show that the law giving rise to any constitutional violation was clearly established. Plaintiff contends that it would be a clear violation of the Fourth Amendment for police officers to fire on an injured, unarmed suspect who was lying on the ground and unable to move. Dkt. # 98, at 15; Dkt. # 99, at 14. Plaintiff's argument that DeGeorge and Myers violated Rucker's clearly established rights is based on his view of the evidence in hindsight, and he fails to take into account how the evidence would have appeared to a reasonable police officer arriving on the scene after Mortensen and Snyder had already started shooting at Rucker. Plaintiff has cited no authority suggesting that backup officers arriving at a scene, where a suspect has attempted to flee and who was found in possession of a firearm the day before the attempted flight, and the backup officers reasonably rely on information that the suspect has just fired upon other officers at the scene, has violated a person's constitutional rights. The Court finds that plaintiff has not met his burden to show that the law giving rise to the alleged

36

constitutional violation is clearly established based on the facts known and conveyed to DeGeorge and Myers when they arrived at the OYO Hotel, and plaintiff's claims against DeGeorge and Myers fail on both prongs of the qualified immunity analysis. DeGeorge's and Myer's motions for summary judgment (Dkt. ## 77, 80) are granted.

## E.

The City argues that plaintiff has not shown that a violation of Rucker's constitutional rights was caused by an official policy or custom, because its use of force policy for TPD officers complies with constitutional requirements and is fairly enforced. Dkt. # 81, at 21-22. Plaintiff responds that the City has numerous unofficial policies or customs allowing the use of excessive force by TPD officers. Plaintiff's arguments are based primarily on prior lawsuits filed by plaintiff's counsel and deposition testimony in this case allegedly showing that the City permitted practices that constituted the use of excessive force or encouraged the escalation of encounters to the point that excessive force was required. Dkt. # 100, at 22-28.

Under § 1983, a local government or municipality may be held liable for adopting an official policy or custom causing a violation of constitutional rights, but local governments can not be sued under a respondeat superior theory of liability. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978). "To establish a claim for damages under § 1983 against municipal entities or local government bodies, the plaintiff must prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights." Moss v. Kopp, 559 F.3d 1155, 1168 (10th Cir. 2009). It is not enough for a plaintiff to allege that the actions of a governmental employee injured him. Olsen v. Layton Hills Mall, 312 F.3d 1304, 1318 (10th Cir. 2002). "Instead, it must be shown that the unconstitutional actions of an employee were

representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action." Seamons v. Snow, 206 F.2d 1021, 1029 (10th Cir. 2000). One way for a plaintiff to prove a claim of municipal liability is to show that an express policy deprived the plaintiff of a constitutional right. Christensen v. Park City Mun. Corp., 554 F.3d 1271, 1279 (10th Cir. 2009). Another way to establish municipal liability is to show that an action taken by a final policymaker for the governmental entity violated or caused a violation of the plaintiff's constitutional rights. Simmons v. Uintah Health Care Special Dist., 506 F.3d 1281, 1285 (10th Cir. 2007).

A municipal policy or custom may take the form of "(1) 'a formal regulation or policy statement'; (2) an informal custom 'amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'; (3) 'the decisions of employees with final policymaking authority'; (4) 'the ratification by such final policymakers of the decisions–and the basis for them–of subordinates to whom authority was delegated subject to these policymakers' review and approval'; or (5) the 'failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.'" Bryson v. Oklahoma City, 627 F.3d 784, 788 (10th Cir. 2010) (quoting Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d 1175, 1189-90 (10th Cir. 2010)).

The City's use of force policy tracks federal constitutional standards for the use of force during an arrest, and the policy expressly incorporates the Graham factors. Dkt. # 81-18, at 1 (stating that the reasonableness of the use of force takes into account "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate

threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight"). An officer may use deadly force "if the officer has probable cause to believe that the suspect poses an imminent threat of serious physical harm, either to the officer or others." Id. The use of force policy provides additional guidance concerning the use of force during an arrest or preventing an escape during an arrest:

> An officer may use deadly force when making an arrest or preventing an escape from custody following an arrest. The officer must reasonably believe that such force is necessary to prevent the arrest from being defeated by resistance or escape, there is probable cause to believe that the person to be arrested has committed a crime involving the infliction or threatened infliction of serious physical harm, and the escape poses an imminent threat to the officer or others. Deadly force may also be used if the person to be arrested is attempting to escape by use of a deadly weapon [OKLA. STAT. tit. 21, § 732]. When feasible, a verbal warning will be given to the offender prior to the use of deadly force.

Id. at 1-2.

The use of force policy facially complies with the constitutional requirements for using force to effect an arrest, but plaintiff argues that in practice TPD officers regularly use excessive force against non-threatening suspects. Plaintiff cites Wilkins v. City of Tulsa, Oklahoma, 33 F.4th 1265 (10th Cir. 2022), and claims that Mortensen was denied qualified immunity when he used pepper spray on an unresisting suspect. Dkt. # 100, at 22-23. Plaintiff claims that Franklin's deposition testimony shows that TPD has endorsed a policy of allowing a police officer to assume a suspect is armed based only on the statements or perceptions of another police officer that the suspect poses a threat to the safety of police officers. Id. at 24. Based on a lawsuit filed by plaintiff's counsel, plaintiff argues that TPD provides inadequate training to its officers for extracting a suspect from a vehicle. Id. at 25-26. Plaintiff also argues that TPD officers have been trained that it is reasonable to use deadly force to stop a fleeing suspect, even if the suspect does not pose a risk of harm to the

officers, and he suggests that Mortensen believes that there is a policy that he can shoot at a suspect if that suspect has used forced against him at any time in the past. Id. at 26-27.

Plaintiff claims that Mortensen was previously denied qualified immunity for using excessive force on a suspect who was "merely moving," and he argues that the City has a policy or custom of allowing officers to use a high level of force against an unresisting suspect who is simply moving. Dkt. # 100, at 23. In Wilkins, three TPD officers, including officer-in-training Mortensen, encountered Ira Lee Wilkins sleeping behind the wheel of a vehicle, and Mortensen believed that Wilkins was committing the crime of having physical control of a vehicle while intoxicated. 33 F.4th at 1270. Wilkins obeyed orders from the officers to exit the vehicle, and he was handcuffed and placed under arrest. Id. Wilkins claimed that he was not physically resisting the officers in any way, and he alleged that Mortensen was causing him unnecessary pain by bending his wrists and pushing him against a patrol car. Id. The officers disputed Wilkins' version of events, and they claimed that he was resisting arresting and they were about to lose physical control of Wilkins. Id. The officers took Wilkins to the ground, and the parties disputes whether Wilkins was continuing to physically resist arrest while he was on the ground. Id. at 1270-71. One of the more senior police officers instructed Mortensen to use pepper spray on Wilkins, and Mortensen complied with order and used pepper spray on Wilkins' face. Id. at 1271. TPD Officer Edel Rangel later told Wilkins to "quit moving" and asked Wilkins if he wanted more pepper spray. Id. The Tenth Circuit resolved all factual disputes in favor of Wilkins and denied the police officers' motions for summary judgment, because a reasonable jury could find that the police officers used excessive force against an unresisting suspect. Id. at 1276-77.

Wilkins bears no significant similarity to the instant case and it does not show that TPD maintains a policy of authorizing the use of force against a suspect who is "merely moving." The City correctly points out that the Tenth Circuit was reviewing a summary judgment record containing disputed facts and, as required by Rule 56, the Tenth Circuit resolved those disputed facts in favor of the non-moving party. The Tenth Circuit did not make a definitive finding that Mortensen or any other police officer actually used excessive force. Contrary to plaintiff's assertions, the Court does not know what actually happened in Wilkins, and the Tenth Circuit's decision merely shows that summary judgment in favor of the police officers was inappropriate when viewing the evidence in a light most favorable to Wilkins. The procedural posture of the case is not the only reason that Wilkins is unhelpful to plaintiff in establishing an official policy or custom. Wilkins broadly concerns the use of force against a suspect who claims that he was not resisting arrest, but it does not suggest that the City maintains a policy of authorizing the substantial use of force against any suspect who is "merely moving." Plaintiff's citation to one case in which there was disputed evidence that police officers may have used excessive force against an unresisting suspect does not mean that TPD trains or encourages its officers to engage in similar conduct.

Plaintiff argues that Franklin's deposition testimony shows that police officers are trained to assume that a suspect poses a threat to police officers based only on the perception of another police officer, even if that police officer has no basis to believe the suspect is armed. Dkt. # 100, at 24-25. In particular, plaintiff contends that DeGeorge and Myers had no basis to use force against Rucker, because they were relying solely on Snyder's and Mortensen's representations that Rucker was in possession of a firearm and had actually fired at police officers. Id. at 24. Franklin testified in his deposition that an officer can consider another police officer's statement implying that a

41

suspect is armed when making the decision to use deadly force.  Dkt. # 96-9, at 26-27.  Mortensen testified that he took into consideration Snyder's commands to Rucker to "drop the gun" when he continued to fire at Rucker.  Dkt. # 96-1, at 84.  According to plaintiff, this evidence shows that the City maintains a policy of encouraging officers to use deadly force based only on the statements of a fellow officer that a suspect is armed.

The Court has considered this issue in the individual context when ruling on DeGeorge's and Myer's motions for summary judgment, but plaintiff has not shown the City maintains a policy of allowing police officers to assume that a suspect is armed.  Plaintiff disregards clearly established precedent that "[p]olice work often requires officers to rely on the observations, statements, and conclusions of their fellow officers," and an officer called to the scene is not required to reevaluate a fellow police officer's conclusions.  Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1260 (10th Cir. 1998).  The Supreme Court has explained that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information."  United States v. Hensley, 469 U.S. 221, 231 (1985).  Plaintiff's argument disregards clearly established precedent that police officers must often rely on another officer's assessment of a situation, and police officers act reasonably when they obtain information from another officer and rely on that information to guide their actions.  In individual situations, it is certainly possible that it would be unreasonable for an officer to rely on obviously inaccurate information provided by another officer, but plaintiff has not shown that allowing police officers to rely on another officer's statement that a suspect is armed and has fired a weapon would constitute an unconstitutional policy or custom.

Plaintiff argues that TPD inadequately trains its officers in proper techniques when attempting to extract a suspect from a vehicle, and he claims that there is "inadequate or non-existent" training based primarily on an allegedly similar case also filed by plaintiff's counsel. Dkt. # 100, at 25; Dkt. # 120. In Michael Delaney v. City of Tulsa, Oklahoma, 21-CV-544-GAG-SH (N.D. Okla.), Michael Delaney alleged that TPD Officer Aaron Russell pulled out his firearm during a traffic stop for no apparent reason, began yelling at Delaney, and shot at Delaney five times as he drove away from the scene. The Honorable Gustavo A. Gelpi entered an opinion and order denying the City's and Russell's motions for summary judgment primarily because the body camera footage did not allow him to resolve factual disputes raised by the parties' competing versions of the events. Delaney v. City of Tulsa, Oklahoma, 766 F. Supp. 3d 1180, 11-85-86 (N.D. Okla. 2025). Summary judgment was also not appropriate as to the City, because Delaney produced some evidence that Russell received inadequate training on vehicle extractions and the situation was "highly predictable" or obviously the result of inadequate training. Id. at 1187-88.

Even if Delaney were directly on point, the Court notes that Delaney is a single case that by itself does not show that TPD maintains a policy of failing to train its officer in the proper procedure for performing a vehicle extraction. However, the Court finds that Delaney is not analogous to the instant case. There was no evidence in Delaney that police officers had prior information that the driver of the vehicle was unlawfully in possession of a firearm or that he had attempted to flee from police on a previous occasion. Russell was also not in any obvious danger from the vehicle as the driver began to accelerate away from the scene, and the trial judge resolved key factual disputes in favor of Delaney as required by Rule 56. In this case, Mortensen had encountered Rucker the day before the shooting, and Rucker fled from the scene in a stolen vehicle and initiated a high speed

43

chase. Police officers were justified in approaching the encounter with Rucker on November 5, 2020 with more caution, and Rucker's conduct in driving toward Mortensen substantially contributed to the escalation of the encounter. While Mortensen could have initiated the encounter in a safer and less provacative manner, plaintiff has not shown that the use of deadly force became necessary due to inadequate training in extracting a suspect from a vehicle.

Plaintiff argues that Mortensen was trained to shoot at any fleeing suspect driving a vehicle, even if the suspect was no longer posed a threat to police officers or the public. Dkt. # 100, at 26-27. Mortensen testified in his deposition that he continued to fire at Rucker's vehicle after it had driven past his position, because it was a rapidly evolving situation and he perceived a risk of harm to the public due to the vehicle's proximity to the hotel. Dkt. # 96-1, at 73. Plaintiff is correct that Tenth Circuit precedent prohibits police officers from using deadly force against a fleeing suspect driving a vehicle when a reasonable officer could not have perceived a risk of harm to himself or others. See Reavis estate of Cole v. Frost, 967 F.3d 978, 995 (10th Cir. 2020). However, this argument fails to establish that the City maintains a policy or custom of allowing police officers to fire on a suspect merely because they are fleeing the scene in a vehicle. Mortensen specifically testified in his deposition that he could not use force based on an "unreasonable" belief that his life was in danger, and he had to exercise discretion to determine when it was appropriate to use lethal force. Dkt. # 96-1, at 72-73. He perceived that Rucker posed a risk of harm to occupants of the hotel, and he was not firing at Rucker merely because he was fleeing the scene of an arrest. Plaintiff's argument is based on a mischaracterization of Mortensen's deposition testimony, and plaintiff has not shown that the City has a policy or custom of encouraging police officers to fire upon any fleeing suspect in a vehicle.

Plaintiff's final argument for the existence of relevant custom or policy is that Mortensen was allegedly trained that he could use deadly force against a suspect who had fired at him at any point in the past. Dkt. # 100, at 27. This argument is again based on a mischaracterization of Mortensen's deposition testimony. The references to the "past" in Mortensen's deposition refer to the events as they unfolded on November 5, 2020 or, in other words, the time immediately preceding the use of force. Dkt. # 96-1, at 81. Plaintiff's counsel asked follow-up questions suggesting a hypothetical situation in which Rucker had fired at police on November 4, 2020, but Mortensen responded that his use of force would be "dictated by his actions in that moment." Id. at 82. Plaintiff has produced no evidence that Mortensen or any other officer believed that the use of deadly force was appropriate based merely on a suspect's behavior during a prior incident, and there is no evidence that the City maintains a "past threat" policy as alleged by plaintiff.

The Court finds that plaintiff has not identified an official policy or custom that could support a § 1983 claim against the City under a theory of municipal liability. Plaintiff's arguments are based primarily on dissimilar incidents involving the use of force by TPD officers and alleged policies extrapolated from deposition testimony which plaintiff's counsel misstates or takes out of context. The City's motion for summary judgment (Dkt. # 81) is granted.

**IV.**

The Court has determined that DeGeorge and Myers are entitled to qualified immunity, and plaintiff may not proceed to trial with his excessive force claims against these officers. Plaintiff has also failed to establish that any violation of Rucker's constitutional rights was caused by an official policy or custom of the City. However, there are genuine disputes as to material facts that preclude summary judgment on Mortensen's and Snyder's qualified immunity defense, and their motions for

45

summary judgment are denied. The remaining parties are directed to file a joint status report no later than 30 days after entry of this Opinion and Order, advising the Court of a schedule for resolving plaintiff's claims against Mortensen and Snyder, including whether any proposed schedule will be impacted by an interlocutory appeal of the Court's qualified immunity rulings.

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment of Defendant Drew DeGeorge and Supporting Brief (Dkt. # 77), the Motion for Summary Judgment of Defendant Dylan Myers and Supporting Brief (Dkt. # 80), and Defendant City of Tulsa's Motion for Summary Judgment and Brief in Support (Dkt. # 81) are **granted**. **Drew DeGeorge, Dylan Myers, and the City of Tulsa, Oklahoma are terminated as parties**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment of Defendant Will Mortensen and Supporting Brief (Dkt. # 78) and the Motion for Summary Judgment of Defendant Michael Snyder and Supporting Brief (Dkt. # 79) are **denied**.

**IT IS FURTHER ORDERED** that the remaining parties shall jointly file a status report concerning scheduling deadlines, including a proposed time frame for trial, no later than **October 8, 2025**.

**DATED** this 8th day of September, 2025.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE